UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MOSHE KUPERMAN,

           Plaintiff,

    -v-                                 No.  20-CV-6834-LTS-VF

NEW YORK CITY DEPARTMENT OF
EDUCATION and RONALD JAMES,

           Defendants.

--------------------------------------------------------x

MEMORANDUM ORDER

        In this action, Plaintiff Moshe Kuperman ("Plaintiff") asserts claims of racial and religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 1981 ("Section 1981"), New York Executive Law section 290 et seq. (the "NYSHRL"), and New York City Administrative Code section 8-101 et seq. (the "NYCHRL"), against the New York City Department of Education (the "NYCDOE") and Ronald James ("Principal James" and, collectively, "Defendants").  These claims arise out of Plaintiff's probationary employment with the NYCDOE between September 2015 and June 2019.  On September 28, 2021, this Court entered a Memorandum Order dismissing Plaintiff's Title VII claims premised on discrete actions occurring prior to January 8, 2019, Plaintiff's NYSHRL and NYCHRL claims against the NYCDOE, Plaintiff's Section 1981 claims against the NYCDOE and Principal James in his official capacity, and Plaintiff's retaliation claims.  (Docket entry no. 25.) Defendants now move, pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment dismissing Plaintiff's remaining claims, namely claims against the NYCDOE for disparate treatment on the basis of race and religion under Title VII and claims under the

NYSHRL and NYCHRL against Principal James.[1]  (Docket entry no. 51.)  The Court has reviewed the parties' submissions thoroughly and, for the following reasons, Defendants' motion is granted.

<u>BACKGROUND</u>

Plaintiff, who identifies as Jewish and white, was employed by the NYCDOE as a probationary physical education teacher at P.S. 202 from 2015 to 2019.  (Docket entry no. 55 ("Pl. 56.1 St.") ¶¶ 6, 43.)   Plaintiff was observed for purposes of performance evaluation approximately six times a year, and received an Annual Professional Performance Review ("APPR") at the end of each year based on ratings derived from those observations.  (Id. ¶ 8; docket entry no. 54-1 ("Kuperman Tr.") at 35-36; docket entry nos. 54-7, 54-8, 54-9, 51-23.)  The observation reports covered eight areas of scrutiny, with four possible ratings for each: Ineffective, Developing, Effective, or Highly Effective.  (Pl. 56.1 St. ¶ 9; <u>see</u> <u>also</u>, <u>e.g.</u>, docket entry no. 51-7.)   Ratings were determined according to a rubric provided to administrators.  (Pl. 56.1 St. ¶ 54.)

During his first two school years (2015-2016) and (2016-2017), Plaintiff received a mix of Effective, Developing, and Ineffective ratings on his observation reports, which were prepared by former Principal Michael Spencer Edwards, Assistant Principal Natasha Raddix ("AP Raddix"), and Interim Principal Ingrid Mason.  (Id. ¶¶ 7-15, 41.)   Plaintiff received Overall Ratings of Developing and Effective for his 2015-2016 and 2016-2017 APPRs, respectively.  (Id.

---

[1]   Title VII claims may not be brought against individual actors.  <u>See</u> <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 79 (2d Cir. 2010) (citation omitted).  Section 1981 claims may not be brought against state actors in their official <u>or</u> individual capacities.  <u>Gonzalez v. City of New York</u>, 377 F. Supp. 3d 273, 284-85 (S.D.N.Y. 2019) (citation omitted).  Plaintiff may not, therefore, assert claims under Title VII or Section 1981 against Defendant James.  To the extent the Court's September 28, 2021, Memorandum Order (docket entry no. 25) was unclear as to the viability of these two claims, the claims are dismissed.

¶¶ 40-41.)  His Measures of Teacher Practice Score ("MOTP"), one of the components of his Overall Rating, was in the Developing category for both years.  (Docket entry nos. 54-7, 54-8.)  His Measures of Student Learning Score ("MOSL"), the other component comprising his Overall Rating, was rated Effective for the 2016-2017 year.[2]  (Docket entry no. 54-7.)

Principal James was hired at P.S. 202 on July 3, 2017.  (Pl. 56.1 St. ¶ 7.)  During the 2017-2018 year, Plaintiff's observations were conducted by Assistant Principal Laya Blanford Vosges ("AP Vosges") and Principal James.  (Id. ¶¶ 16-20.)  Plaintiff again received a mix of Effective, Developing, and Ineffective ratings on his observation reports.  (Id. ¶¶ 45, 47.)  The two observation reports completed by Principal James contained five Ineffective ratings and three categories marked "N/A," and six Ineffective ratings and two categories marked "N/A," respectively.  (Id. ¶¶ 17, 19; docket entry nos. 51-15, 51-17.)  Plaintiff acknowledged receipt of the first report by Principal James, and refused to sign the second.  (Pl. 56.1 St. ¶¶ 17, 19.)  Plaintiff received an Overall Rating of Effective for the 2017-2018 APPR, with his MOTP rated as Developing, and his MOSL rated as Effective.  (Id. ¶ 21.)  Plaintiff testified that Principal James warned Plaintiff at the end of the 2017-2018 school year that his "career [was] on the line" due to the low score.  (Kuperman Tr. at 41-45; see also docket entry no. 51-19 ("2017-2018 Summary of MOTP Score").)

Following the 2017-2018 school year, AP Vosges left P.S. 202, and AP Raddix's employment was discontinued by Principal James.  (Docket entry no. 51-5 ("James Tr.") at 35-37.)  Marsha Murat, who had been a literacy coach at P.S. 202, was subsequently elevated to the position of Assistant Principal by Principal James.  (Docket entry no. 51-6 ("Murat Tr.") at 12-

---

[2]    The 2015-2016 APPR is formatted differently than those for the following three years and does not include mention of MOSL.  (See docket entry no. 54-7.)  The other standard provided, "Local Measures," is rated as Effective.  (Id. at 1.)

13; James Tr. at 34-37.)  Plaintiff's 2018-2019 observations were conducted by Principal James

and Assistant Principal Murat ("AP Murat").  (Pl. 56.1 St. ¶¶ 22-24.)  Three observation reports

for the 2018-2019 school year are in the record before the Court—two reports from Principal

James and one report from AP Murat.  (Id.)  The first two observations, which were conducted

by Principal James and AP Murat, respectively, resulted in a mix of Ineffective and "N/A"

ratings.  (Docket entry nos. 51-20, 51-21.)  The final observation, conducted by Principal James

in June of 2019, resulted in a mix of Effective, Developing, and Ineffective ratings.  (Docket

entry no. 51-22.)  Plaintiff was reminded in the June 2019 observation report that "continued

ineffective/developing lessons and/or multiple an [sic] ineffective/developing MOTP Year-end

ratings may lead to charges under the educational law and/or denial of tenure or ending of

probationary service."  (Id.)  Plaintiff refused to sign any of the three observation reports.

(Docket entry nos. 51-20, 51-21, 51-22.)

Plaintiff's employment was discontinued in June 2019, following Principal

James' recommendation to the superintendent that Plaintiff's probationary period not be

extended.  (Id. ¶¶ 25, 93.)  Principal James testified that his decision to recommend discontinuing

Plaintiff was because "he was an ineffective teacher."  (Id. ¶ 25.)  Plaintiff was the only teacher

discontinued at the end of the 2018-2019 school year.  (Id. ¶ 94.)

<u>Allegations of Racial and Religious Discrimination</u>

Plaintiff testified that, on September 5, 2018, during a professional development

meeting ahead of the 2018-2019 school year, Principal James shared with the staff members

present his story of why he became an educator.  (Pl. 56.1 St. ¶ 27.)  Plaintiff summarizes the

speech as follows:

> [Principal James] gave a story about when he was younger his parents sent him to a
> predominately white school. So he was the one and only colored student and a

> teacher picked on him, calling him names or said that he was dirty. Another teacher
> embraced him and taught him basic skills such as Math and English, and then he
> went into his why he became an educator, but he said that he became an educator
> No. 1 because of the color of his skin.

(Id.)  Principal James acknowledged during his deposition testimony that he had discussed

"an uncomfortable situation" during elementary school "that motivated [him] to become a

school leader, an educator," and that he "made mention of the fact that [he] was the only

black child in the classroom." (Id.; see also James Tr. at 111-14.)  However, Principal

James claimed that he "didn't make mention of any or who or what race this particular

[teacher who embraced him] was or religion for that matter" during the speech.  (James Tr.

at 114.)

Plaintiff testified that, later during the 2018-2019 school year, on March 7, 2019,

Principal James asked if he was Jewish during a meeting to discuss Plaintiff's application for

tenure.  (Pl. 56.1 St. ¶¶ 28, 90.)  The tenure applications are submitted in the form of a binder

that demonstrates an applicant's progress.  (Id. ¶¶ 32, 91.)  Plaintiff also testified that Principal

James took several days to approve Plaintiff's requests for time off for religious holidays.  (Id. ¶¶

87-88.)  Plaintiff testified as to one particular incident, also in March of 2019, when Principal

James allegedly asked payroll secretary Diane Benessere if Plaintiff had requested time off for

the same religious holiday the previous year.  (Id. ¶¶ 30, 87.)  Plaintiff described Principal James

as "reluctant" to grant the request.  (Id. ¶ 87.)  Plaintiff claimed that he heard of these events

from Ms. Benessere.  (Id. ¶ 30.)  Plaintiff was never denied a request for time off for religious

observance.  (Id.; Kuperman Tr. at 39.)

Plaintiff also submitted numerous reports and emails to Principal James

throughout the last two years of his employment with the NYCDOE, detailing incidents with

students during which Plaintiff was at times struck physically by students and insulted,

sometimes based upon his race or religion.  (<u>Id.</u> ¶¶ 35-39, 75-76.)  In February of 2019, Plaintiff requested a transfer of schools due to hardship stemming from the incidents with students.  (<u>Id.</u> ¶ 85.)

On August 24, 2020, Plaintiff filed a complaint asserting claims against the NYCDOE and Principal James under Title VII, Section 1981, and the NYSHRL and NYCHRL. (Docket entry no. 2.)

Before the Court is Defendants' motion for summary judgment on the remaining Title VII disparate treatment claims against the NYCDOE premised on acts that occurred after January 8, 2019, and the NYSHRL and NYCHRL claims against Defendant James.

<u>DISCUSSION</u>

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Holtz v. Rockefeller & Co. Inc.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Caldarola v. Calabrese</u>, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." <u>Golden Pac. Bancorp v. FDIC</u>, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). In that event, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. (citing Celotex Corp., 477 U.S. at 322-23). "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

In determining whether there is a genuine issue of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted). In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. Turner v. NYU Hosps. Ctr., 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)), aff'd, 470 F. App'x 20 (2d Cir. 2012).

The Court addresses Plaintiff's Title VII claims and his NYSHRL and NYCHRL claims in turn.

Title VII Claims against the NYCDOE

In evaluating Title VII discrimination claims where the plaintiff lacks direct evidence of discriminatory conduct, the Court applies the familiar burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). At the first step of

McDonnell Douglas, the plaintiff bears the burden of establishing a prima facie case of discrimination by showing that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (citation omitted).  "A plaintiff's burden of establishing a prima facie case is de minimis."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001) (citation omitted).

If the plaintiff proffers a prima facie case, the burden of production shifts to the employer to rebut the presumption of unlawful discrimination by proffering a legitimate, nondiscriminatory reason for the adverse employment action.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  The employer need not prove by a preponderance of evidence that the challenged action was not the product of discrimination, "but may simply 'present clear and specific reasons for the action.'"  Gibbs v. Cons. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989) (quoting Neale v. Dillon, 534 F. Supp. 1381, 1387 (E.D.N.Y. 1982), aff'd, 714 F.2d 116 (2d Cir. 1982)).

If an employer is able to rebut the presumption of discrimination raised by the prima facie case, the Court's final task on a motion for summary judgment is to "examin[e] the entire record," using a case-specific approach, "to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff," Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted), "without the aid of the presumption of unlawful discrimination."  Holcomb v. Iona College, 521 F.3d 130, 141 (2d Cir. 2008); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 81 (2d Cir. 2001) ("After each party has satisfied [their] initial burdens under McDonnell

Douglas, the plaintiff's ultimate burden of persuasion is the burden she bore from the outset – to persuade the tier of fact that she was the subject of illegal discrimination.").  To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.'"  Holtz, 258 F.3d at 78-79 (citations omitted).

<u>Step One – Plaintiff's Prima Face Case</u>

Defendants dispute the fourth and final element of Plaintiff's prima facie case—arguing that he has not shown that his discontinuance "occurred under circumstances giving rise to an inference of discriminatory intent."  (Docket entry no. 48 ("Defs. Mem.") at 3-8.)  "Because discrimination claims implicate an employer's usually unstated intent and state of mind . . . rarely is there 'direct, smoking gun, evidence of discrimination.'"  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) (citations omitted).  As a result, "plaintiffs usually must rely on 'bits and pieces' of information to support an inference of discrimination, i.e., a 'mosaic' of intentional discrimination."  Id. (citations omitted).  Such circumstantial evidence can include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (citations omitted).  However, as noted, at the summary judgment stage, the nonmoving party "cannot rely on allegations in the complaint, but must counter the movant's affidavits with specific facts showing the existence of genuine issues warranting a trial."  McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004).

Plaintiff alleges that he was discriminated against based on both his race and religion.

### Racial Animus

Plaintiff has proffered testimony that he was replaced by a teacher outside of his protected category—specifically, a teacher who was African-American was hired to perform the same job duties.  (Docket entry no. 56 ("Pl. Mem.") at 7.)  This assertion is undisputed and is supported by evidence in the record.  (Pl. 56.1 St. ¶ 97; Pl. Mem. at 7; docket entry no. 59 ("Reply Mem.") at 2-3.)  Because the burden at the initial prima facie stage is minimal, and the Second Circuit has repeatedly held that "an inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class," Littlejohn v. City of N.Y., 795 F.3d 297, 312-13 (2d Cir. 2015) (citations omitted), Plaintiff's replacement by an individual outside of his protected class will suffice to raise an inference of discrimination for prima facie purposes.

### Religious Animus[3]

In support of his argument that an inference of discrimination based on religion can also properly be drawn in connection with his discontinuance, Plaintiff testified that Principal James asked whether Plaintiff was Jewish on March 7, 2019, at the start of a meeting to discuss Plaintiff's application for tenure, and that Principal James did not provide a neutral reason for asking the question at that time.  (Pl. 56.1 St. ¶¶ 28, 90.)  This meeting took place only a few months before Plaintiff's June 2019 discontinuance (id. ¶¶ 26, 95) and, while Principal James was not personally responsible for the decision to discontinue Plaintiff, Principal James

---

[3]    The record does not contain any information regarding the religious affiliation, if any, of the teacher who replaced Plaintiff.

recommended his findings that Plaintiff was "an ineffective teacher" to the superintendent (James Tr. at 118-19), and had the option to extend Plaintiff's probation (id. at 117).  Plaintiff contends that the remark is indicative of religious bias as a motivation for the discontinuation of Plaintiff's employment.  (Pl. Mem. at 8-9.)

        In determining whether a comment is a probative statement evidencing an intent to discriminate or whether it is a non-probative "stray remark," courts must consider:

> (1) who made the remark, i.e., a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision-making process."

Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp. 2d 628, 637 (S.D.N.Y. 2005) (citations omitted).

        Again, in view of the de minimis burden on Plaintiff to establish a prima facie case at Step One of McDonnell Douglas, and the evidentiary issues underlying Plaintiff's other proffered evidence of religious discrimination that cannot be resolved at this juncture (see discussion infra at 22-23), the Court finds that Principal James' question regarding Plaintiff's religious affiliation and the context in which it was posed are sufficient to support the inference of causation that is required to establish a prima facie case of religious discrimination for purposes of this Motion.  Cf., e.g., Weinstein v. City of New York, No. 16-CV-6034-LTS-DCF, 2019 WL 1410746, at *8 (S.D.N.Y. Mar. 28, 2019) (finding alleged comment made at unknown time to be stray remark insufficient to support prima facia case where, inter alia, the record revealed no other indicia of discrimination, and the speaker neither made the final decision to terminate the plaintiff nor authored the report recommending plaintiff's termination); Posner v. Sprint/United Mgmt. Co., 478 F. Supp. 2d 550 (S.D.N.Y. 2007) (finding remark made by vice

president of employer to be stray remark considering the remoteness of the remark, the fact that it was made by a non-supervisor, and the words themselves).

The Court will therefore proceed to the remaining steps of <u>McDonnell Douglas</u> regarding Plaintiff's claims premised on both racial and religious discrimination.

<u>Step Two – Defendants' Non-Discriminatory Justification</u>

At step two of <u>McDonnell Douglas</u>, the burden shifts to Defendants to provide a legitimate non-discriminatory reason for the adverse action, <u>i.e.</u>, Plaintiff's discontinuance. Defendants claim that he was terminated because he was an ineffective teacher, as shown by Plaintiff's observation scores and inability to manage his classroom.  (Pl. 56.1 St. ¶¶ 25, 38; Pl. Mem. At 7.)  This proffer, which is supported with observation reports over Plaintiff's four-year probationary term, is sufficient to carry Defendants' burden of identifying a legitimate non-discriminatory reason for the challenged action, rebutting Plaintiff's prima facie showing.  <u>See Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 845 (2d Cir. 2013) (observing that "poor work performance" was a legitimate non-discriminatory reason for the plaintiff's termination).  The Court therefore moves to the final stage of the <u>McDonnell Douglas</u> inquiry.

<u>Step Three – Plaintiff's Burden of Persuasion</u>

With the presumption of unlawful discrimination rebutted by Defendants, the Court must now determine "whether, without the aid of the presumption, [Plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to [discontinue] him was based, at least in part," on his race or religion.  <u>Holcomb</u>, 521 F.3d at 141.  As noted, in employment discrimination cases, direct evidence of intentional discrimination is rare.  <u>Holtz</u>, 258 F.3d at 76.  Accordingly, "in building a circumstantial case, employment discrimination plaintiffs [normally] contend . . . that the

employer's stated reason for the adverse employment action is entirely pretextual."  Holcomb, 521 F.3d at 141.

Determining whether the record as a whole could permit "the required ultimate finding of discrimination" requires a case-specific approach that considers a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" on a motion for summary judgment.  Zimmerman v. Assocs. First Cap. Corp., 251 F.3d 376, 381 (2d Cir. 2001) (citing Reeves, 530 U.S. at 148-49)).  "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive."  Holcomb, 521 F.3d at 141 (citing Reeves, 530 U.S. at 147).  If, however, "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," "[a]n employer would be entitled" to summary judgment.  Reeves, 530 U.S. at 148; Schnabel v. Abramson, 232 F.3d 83, 89 (2d Cir. 2000) (finding that Reeves, involving a post-verdict motion for judgment as a matter of law, "applies with equal force on a motion for summary judgment").

Applying these principles, the Court concludes that Defendants' motion for summary judgment must be granted, because Plaintiff has not proffered sufficient evidence to frame a genuine dispute of fact as to the Defendants' proffered reason for his discontinuance being pretextual, and Plaintiff has otherwise proffered minimal evidence to support his claims of racial and religious discrimination.

<u>Issue of Pretext</u>

Plaintiff contends that "[t]here is a genuine issue of fact that [Plaintiff] was targeted by his administration with observation reports containing only Ineffective ratings," which could indicate pretext for discrimination.  (Pl. Mem. at 15.)  As evidence of this coordinated effort, Plaintiff claims that he had never received "Ineffective" ratings in every category of an observation report prior to Principal James' starting arrival at P.S. 202.  (<u>Id.</u>)

However, the record evidence in this case demonstrates that Plaintiff had consistently received mixed reviews prior to Principal James' start (<u>see</u> docket entry nos. 51-7, 51-8, 51-9, 51-10, 51-12) and afterwards (docket entry nos. 51-14 (October 2017 evaluation by AP Vosges), 51-16 (March 2018 evaluation by AP Vosges).  Moreover, a number of the observation reports also mention Plaintiff's difficulty controlling the classroom and/or concerns for student safety, again both prior to (<u>see, e.g.</u> docket entry nos. 51-8 at 3, 51-12 at 3) and during Principal James' tenure (docket entry no. 51-14 at 1, 3-4), Plaintiff's "Measures of Teacher Practice" score never exceeded a rating of "Developing" in his four years of probationary teaching (<u>see</u> docket entry nos. 54-7, 54-8, 54-9, 51-23), and AP Murat also rated Plaintiff ineffective in every category during at least one of the observations she conducted (<u>see</u> docket entry no. 51-21).

While Plaintiff may feel that the evaluations during Principal James' tenure "did not reflect his actual performance" (Pl. Mem. at 16), Plaintiff's "subjective disagreement with his evaluations, without more, does not raise a genuine dispute as to the issue of pretext."  <u>See</u> <u>Valentine v. Standard & Poor's</u>, 50 F. Supp. 2d 262, 284-85 (S.D.N.Y. 1999) (citing <u>Jimoh v. Ernst & Young</u>, 908 F. Supp. 220, 226 (S.D.N.Y. 1995)).  The fact that Principal James' and AP Murat's evaluations were generally more negative than those of other supervisors is also

insufficient to demonstrate pretext in view of the record evidence.  Forte v. Liquidnet Holdings, Inc., 2015 U.S. Dist. LEXIS 136474, at *33 (S.D.N.Y. Sep. 30, 2015) (citations omitted), aff'd, 2017 U.S. App. LEXIS 583 (2d Cir. Jan. 10, 2017).  While courts have found a negative shift in performance evaluations to indicate pretext when the record also contained positive performance reviews, bonuses, or salary increases, together with some evidence of discriminatory animus, see, e.g., id. (gathering cases), the record in this case shows largely mixed performance reviews.

In furtherance of his argument that there was a campaign against him, Plaintiff cites United States v. New York City Dep't of Educ., 407 F. Supp. 3d 365 (S.D.N.Y. 2018), for the proposition that "there are material issues of fact that Principal James recruited AP Murat to help him build a record against Mr. Kuperman to get rid of him."  (Pl. Mem. at 18.)  The pertinent portion of the cited opinion involved a claim for constructive discharge, where the Court found the element of "intent to create an intolerable environment" satisfied by the probationary teacher-plaintiffs' evidence indicating that the principal was "intentionally building a record of unsatisfactory observation reports in order to oust" them and that no other probationary teachers had been given unsatisfactory lesson ratings.  United States v. New York City Dep't of Educ., 407 F. Supp. 3d at 395.  Also relevant to the court's finding in that case was testimony by the assistant principal that the principal "explicitly told him not to provide [one of the plaintiffs] with any support or make her a better teacher," a remark that was corroborated by another employee.  Id.

Aside from the fact that the cited case arose in the context of a different cause of action that sounded in harassment, the facts are readily distinguishable from the instant case.  As noted, Plaintiff's record already contained mixed reviews of effectiveness before the allegedly prejudiced principal took office.  Moreover, while AP Murat, who was in her first year serving as

an assistant principal, indicated that Plaintiff was the only teacher she had rated as ineffective in

every category[4] (Pl. 56.1 St. ¶ 55), she noted that such a practice was not unusual (Murat Tr. at

21-22), and Principal James' testimony that there were in fact other teachers he had repeatedly

rated ineffective (James Tr. at 57-58) is uncontroverted.  AP Murat denied any type of

coordinated campaign (Murat Tr. at 17-19), and Plaintiff has not proffered evidence of any other

probationary teacher's ratings during the relevant time period that would tend to demonstrate that

Plaintiff was singled out or targeted for negative performance evaluations.  As explored further

in the following sections, Plaintiff's allegations regarding comparably better treatment of other

teachers are also deficient, as they do not adequately establish that the comparator employees

were similarly situated or do not constitute admissible evidence.  In short, Plaintiff's unsupported

speculation that there was a coordinated campaign against him does not create a genuine dispute

as to the issue of pretext.  Nor, as explained below, has Plaintiff otherwise raised any triable

issue of fact as to whether racial or religious discrimination were motivating factors in the

discontinuance of his employment as a probationary teacher.

<u>Racial Discrimination</u>

Plaintiff proffers the following to support an inference of racial discrimination:

(1) his testimony that he was treated less well than non-Jewish, African-American colleagues

---

[4]     Plaintiff contends that AP Murat's "explanations about how she rated Mr. Kuperman
were inconsistent," because she testified that "she had no evidence to rate him," whereas
Principal James testified that "if [he had] no evidence to support a particular domain, then
[he did not] have to rate it at that moment."  (Pl. Mem. at 17.)  However, as Defendants
point out, AP Murat testified that she did not observe his lesson plan because "[f]rom the
time that I was sitting there, there was no instruction to observe. He was simply trying to
manage behaviors."  (Murat Tr. at 40.)  This testimony is consistent with AP Murat's
contemporaneous comments on the relevant observation report, which note that, "All
students sat on the gym floor for the entire 15 minutes of observation while teacher
attempted to correct behaviors of individual students," and that, "There was no evidence
of instructional flow or routines."  (Docket entry no. 51-21 at 1.)

who were also on probation; (2) Principal James' remarks during the September 2018 professional development meeting, which Plaintiff asserts "exhibit[ed] racial . . . animus"; (3) "the administration's failure to address Mr. Kuperman's reports of students' discriminatory behaviors towards him"; and (4) as discussed at Step One, the replacement of Plaintiff by a teacher outside his protected category, namely, by a teacher who was African-American.  (Pl. Mem. at 6-15.)

As evidence of comparatively poor treatment, Plaintiff testified that three non-Jewish, African-American teachers—Kimberly Dent, Rosemarie Worrie, and Stirleeta Catlin—who were also on probation, received ongoing support from the school administration, such as information and advice regarding their applications for tenure.[5]  (Pl. Mem. at 14-15.)  Plaintiff offers no admissible evidence to corroborate his contention that these three teachers were given more support in seeking tenure.  Plaintiff testified that he knew such support was given because it was "what [he'd] heard through different teachers, and you know, they were pretty much on good terms with [Principal James]," and because one of the teachers, Ms. Catlin, "seemed to know a lot more information than [Plaintiff] ever knew" about the tenure process. (Kuperman Tr. at 61-62.)  Plaintiff did not identify the source(s) of his information or proffer evidence that Principal James provided extra information to Ms. Catlin or any of the others.  (Id. at 62 ("Q. Did [Ms. Catlin] ever say Mr. James told her that? A. She didn't say directly.").)  Plaintiff's

---

[5]    Plaintiff also proffers anecdotal hearsay that another white, Jewish, employee, Laurie Wilen, felt she was targeted by AP Murat based on her race due to the way in which a particular observation of Ms. Wilen was conducted.  (Pl. Mem. at 14-15; Kuperman Tr. at 62-63.)  Plaintiff has not articulated a proper purpose for which these hearsay statements could be offered, and Ms. Wilen has not been deposed or submitted an affidavit supporting this narrative.  Absent a showing that such evidence could be presented in admissible form at trial, it cannot be considered on summary judgment.  Figueroa v. Mazza, 825 F.3d 89, 98 n.8 (2d Cir. 2016) (citations omitted).

unsupported speculation is insufficient under Rule 56 to frame a material issue of fact as to whether the named non-Jewish, African-American probationary teachers were provided with special assistance that Plaintiff was denied.  Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is insufficient to preclude the granting" of a motion for summary judgment.).

Plaintiff also notes that he was the only teacher discontinued at the end of the 2018-19 school year, but he provides no evidence that he was similarly situated to the three named non-Jewish, African-American teachers, other than the fact that these teachers were also probationary.[6]  (Pl. Mem. at 14-15; Pl. 56.1 St. ¶¶ 94-95.)  Plaintiff does not, for example, offer evidence indicating how many prior years of probation these other teachers had served, whether they were teaching under similar conditions, such as a similar number of students with similar behavioral challenges, and whether these teachers were, contrary to Plaintiff's allegations regarding his own treatment (see, e.g., Pl. 56.1 St. ¶¶ 73-74), given meaningful support to mitigate inappropriate or disruptive student behavior.  Nor does Plaintiff proffer evidence of these teachers' observation reports or APPR ratings during the relevant period.  Without a similarly situated comparator, the mere fact that Plaintiff was the only probationary teacher discontinued at the end of the 2018-2019 school year is of little probative value.  See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (explaining that a plaintiff attempting to show that "the employer treated plaintiff less favorably than a similarly situated employee outside his

---

[6]    Principal James testified that two of these teachers, Ms. Worrie and Ms. Dent, were discontinued in subsequent years.  (James Tr. at 97-98.)  Plaintiff speculates, with no foundation in the record, that "a reasonable trier of fact could find that Principal James retaliated against Ms. Dent for being named in [Plaintiff's] complaint, in order to disguise his discriminatory conduct."  (Pl. Mem. at 15.)

protected group" must show he "was similarly situated in all material respects" to the comparator (internal quotation marks and citation omitted)).

Plaintiff's testimony regarding his subjective interpretation of Principal James' motivation for becoming a teacher is also conclusory. Plaintiff testified that Principal James did not make remarks that were in any way critical of Plaintiff's race. (Kuperman Tr. at 31-32.) Rather, Plaintiff testified that, in light of the negative observations ratings the year before that he felt were "unfair," he felt targeted hearing Principal James' speech because he "felt it right there, but kind of felt it before, but [Principal James] spelled it out" in telling the story. (Kuperman Tr. at 30-31.) Plaintiff interpreted the speech as evidence that Principal James "intended maybe to retaliate against whites." (Kuperman Tr. at 41.) Plaintiff's subjective reaction to the mention of race does not support any reasonable inference of a discriminatory motivation on the part of Principal James.

Finally, Plaintiff alleges that the P.S. 202 administration, including Principal James, failed to take appropriate remedial action in response to student harassment, which Plaintiff contends further indicates bias on the part of Principal James. (Pl. Mem. at 6, 11-14.) The record contains reports of three incidents that involved racially or religiously derogatory comments by students. The first instance took place in September 2018, when a student asked Plaintiff if he was white or Jewish after she and another student had mocked Plaintiff for sweating. (Docket entry no. 54-18 at 1.) This incident appears to have been first reported on January 17, 2019. (Id.) The second incident occurred on January 7, 2019, at which time a student called him a "white rapist." (Docket entry nos. 54-3; 54-18; 51-28 at 2.) Finally, on January 31, 2019, a student said to Plaintiff, "You were black but I slapped you so hard you became white." (Docket entry no. 54-18.)

Defendants assert, and Plaintiff does not dispute, that the proper course of action for addressing inappropriate student behavior is to file an incident report within 24 hours of the incident, to call the parents of the student involved, and to attempt to manage and monitor student behavior through use of a behavior reward system.  (Defs. Mem. at 4-5; Pl. 56.1 St. ¶¶ 39, 63-64, 81-82; Murat Tr. at 32-33; 38.)  Nor does Plaintiff dispute that he filed an incident report regarding only one of the incidents or that, while Defendants could not recall the exact response to Plaintiff's report in particular, the student in question was already on a behavior monitoring plan, and Defendants had spoken with the parent on multiple different occasions. (Murat Tr. at 34-35.)  Notably, in response to another incident that Plaintiff reported properly, which did not involve racial or religious insults, the offending student was suspended.  (Pl. 56.1 St. ¶ 36; James Tr. at 142.)  Plaintiff does not explain how Defendants' purported failure to address the remaining incidents that were not reported according to proper procedure indicates bias on the part of Principal James or other P.S. 202 administrators.[7]

---

[7]      To the extent Plaintiff is seeking to assert a claim under a new theory of liability under Title VII, hostile work environment, this claim, too, fails.  To succeed on a Title VII hostile work environment claim, a plaintiff must establish: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer."  Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013) (citation omitted).  Moreover, the conduct must be discriminatory.  See Harris v. Forklift Systems, Inc. 510 U.S. 17, 21 (1993). Plaintiff's claim fails at prong one.  The three incidents identified by Plaintiff that pertain to race or religion over the course of approximately five months are "episodic," rather than "sufficiently continuous and concerted" so as to establish liability under Title VII. Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015); see also Harris, 510 U.S. at 21 (Title VII is violated "when the workplace is permeated with "discriminatory intimidation, ridicule, and insult.").  Moreover, while each of the comments made by students was no doubt offensive, none rises to the level of extraordinary severity that courts have recognized as potentially giving rise to liability in isolation.  See, e.g., Mathirampuzha v. Potter, 548 F.3d 70, 79 (2d Cir. 2008) (noting that a single incident of sexual assault, as an example, could create a hostile work environment).

In sum, the factual evidence supporting Plaintiff's case of racial discrimination boils down to the facts that he was the only teacher discontinued at the end of the 2018-2019 school year, that he was replaced by an individual outside of his protected class, that Principal James shared an anecdote linking his own experience with discrimination, a kind teacher's outreach, and his race with his own motivation to become an educator, and that there were incidents in which unruly P.S. 202 students made remarks about Plaintiff's race and religion.  To this Plaintiff adds his belief that the school administration did not take sufficient steps to address inappropriate student conduct, most of which was not properly and promptly reported, and his belief, based on hearsay and his subjective perceptions of motivation, that his inability to succeed as a probationary teacher at P.S. 202 was the product of racial discrimination.  The Court is mindful that evidence of intentional discrimination will rarely be overt, but a reasonable jury could not conclude by a preponderance of the evidence that the decision to discontinue Plaintiff was based, at least in part, on his race, relying solely on Plaintiff's subjective speculation and this thin record, particularly where pretext has not been shown.  See, e.g., Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) (affirming grant of summary judgment where pretext not established and "plaintiff ha[d] presented no evidence upon which a reasonable trier of fact could base the conclusion" that the relevant protected characteristic was "a determinative factor" in his discontinuance).  Defendants are therefore entitled to summary judgment dismissing Plaintiff's federal discrimination claim premised on his race.

<u>Religious Discrimination</u>

In support of his argument that an inference of discrimination based on religion can properly be drawn in connection with the termination of his employment, Plaintiff testified that Principal James asked whether Plaintiff was Jewish on March 7, 2019, at the start of a

meeting to discuss Plaintiff's application for tenure, and that Principal James did not provide a neutral reason for asking the question at that time.  (Pl. 56.1 St. ¶ 28.)  Principal James denies having asked the question.  (James Tr. at 106.)

Plaintiff also testified (1) that Principal James questioned his secretary regarding Plaintiff's request to observe a religious holiday on March 29, 2019, (2) that Diane Benessere, a payroll secretary for P.S. 202, had described Principal James as "reluctant" to grant the holiday absence request, and (3) that Principal James generally "played around" with Plaintiff's requests for time off for religious holidays.  (Pl. 56.1 St. ¶ 30.)  Plaintiff did not observe Principal James "play[ing] around" with holiday requests himself, but asserted that he had heard of the conduct from Ms. Benessere.  (Kuperman Tr. at 56-57.)  Principal James and Ms. Benessere have proffered testimony denying Plaintiff's assertions as to Principal James' alleged conduct and Ms. Benessere's alleged statements about the conduct.  (Defs. 56.1 St. ¶ 30; James Tr. at 103-107; docket entry no. 51-4 ("Benessere Aff.").)  Defendants also characterize Principal James' alleged question regarding Plaintiff's religion as an immaterial "stray remark," and note that Plaintiff was never denied a request for a religious holiday.  (Defs. Mem. at 4.)

Assuming that Principal James did ask Plaintiff whether he is Jewish, a remark that is not on its face discriminatory, the only other evidence of religious discrimination proffered by Plaintiff is his assertion that the administration did not properly respond to his complaints of student harassment, as discussed at length in the preceding section,[8] his

---

[8]    The only such incident pertaining to Plaintiff's religion was in September 2018, when a student asked Plaintiff if he was white or Jewish after she and another student had mocked Plaintiff for sweating.  (Docket entry no. 54-18).  As discussed in the preceding section, Plaintiff did not report this incident using the proper incident report, and first raised the issue in an email to Principal James nearly four months later.  (See id.) Plaintiff does not discuss how a purported lack of response by the P.S. 202 administration for improperly reported incidents suggests bias.

unsupported allegations that non-Jewish, African-American teachers were given preferential treatment,[9] and his testimony regarding Principal James' reluctance to sign off on holiday requests for religious observance, which is premised wholly on hearsay attributed to Principal James' interactions with Ms. Benessere, (Kuperman Tr. at 57 ("A. Did you observe it yourself or did [Ms. Benessere] tell you? A. I didn't observe."); see also id. ("A. This was all word of mouth. This was from [Ms. Benessere's] mouth.").)  Defendants have proffered an affidavit from Ms. Benessere denying that she made the statements that Plaintiff attributes to her.  (See Benessere Aff. ¶¶ 5-6.)

Even if Plaintiff could establish a non-hearsay basis for admission of the remarks attributed to Ms. Benessere, Principal James does admit that "if he was unclear as to whether or not [a particular day] was a day that somebody was eligible to take off," he would ask Ms. Benessere whether a particular day was a holiday "based on the New York City Department of Education holiday schedule" (James Tr. at 104-105), and there is nothing plainly improper with Principal James ensuring that requests for religious observance were based upon holidays with which he was unfamiliar.  (Id.)  Ms. Benessere states in her affidavit that Principal James would ask her "what a holiday request related to and approve[] the request once informed what it was." (Benessere Aff. ¶ 4.)  Plaintiff concedes that he was never denied a requested day off for religious observance, and his proffered examples of requests for religious absence show that Principal James approved Plaintiff's requests in roughly two to four business days.[10]  (See docket entry no. 54-23 ("Reqs. For Rel. Accom.").)  Plaintiff does not provide evidence that this

---

[9]     See discussion supra, at 17-19.

[10]    Principal James' approval of Plaintiff's September 2017 request for time off for Sukkot is
        undated.  (See Reqs. For Rel. Accom. at 3.)

timeframe was longer than Principal James' typical timeline for approving requests for time off, nor that Principal James only verified Jewish holidays prior to approving such requests.

In sum, Defendants have proffered considerable evidence to support their contention that Plaintiff's discontinuance was not motivated by discriminatory animus on the basis of religion, as discussed in the foregoing section regarding pretext, and Plaintiff's evidence proffered in support of his allegations of religious discrimination is insufficient to frame a genuine issue of fact as to whether his termination was motivated by religious bias. See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (to defeat summary judgment, plaintiff is obliged not just to produce "some" evidence, but must produce sufficient evidence to support a rational jury verdict in his favor). Accordingly, Defendants' motion for summary judgment on Plaintiff's federal discrimination claim on the basis of his religion is granted.

NYSHRL and NYCHRL Claims

Because the Court is granting the Defendants' motion for summary judgment on the remaining federal claims, the Court has the discretion to decide whether to exercise supplemental jurisdiction over Plaintiff's remaining state and local law claims, which are asserted against Principal James. See Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); 28 U.S.C. § 1367(c) (providing that court may decline to exercise supplemental jurisdiction where, inter alia, the claim "substantially predominates over the claim or claims of which the district court has original jurisdiction" and where "the district court has dismissed all claims over which is has original jurisdiction"). The Court must consider "the values of judicial economy, convenience, fairness, and comity" to determine whether to exercise supplemental

jurisdiction.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).  The Supreme Court

has noted that, "in the usual case in which all federal-law claims are eliminated before trial, the

balance of [these] factors . . . will point toward declining to exercise jurisdiction over the

remaining state-law claims."  Id. at 350 n.7.

Because all of the claims of which the Court has original federal question

jurisdiction are being dismissed, state and local law claims clearly dominate what would remain

of this litigation, Plaintiff has not yet made clear which of the many potential claims under the

NYSHRL and NYCHRL he intended to raise against Principal James, and the parties have

devoted little argumentation as to whether Plaintiff's claims meet the differing standards under

these laws, the Court declines to exercise supplemental jurisdiction of these claims and dismisses

them without prejudice to litigation in a forum of competent jurisdiction.  See 28 U.S.C. §

1367(c).

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted

in its entirety.  The Clerk of Court is respectfully directed to enter judgment dismissing

Plaintiff's federal law claims and declining to exercise jurisdiction of Plaintiff's state and local

law claims, and then to close the case.  This Memorandum Order resolves docket entry no. 51.


SO ORDERED.

Dated: July 11, 2024
        New York, New York

                                            /s/ Laura Taylor Swain
                                            LAURA TAYLOR SWAIN
                                            Chief United States District Judge